# In the United States Court of Federal Claims

No. 15-359
(Filed: February 1, 2016)

| | |
|---|---|
| JERET ROGERS, ) | Keywords: Military Pay; 37 U.S.C. § 204; |
| Plaintiff, ) | Wrongful Discharge; Procedural |
| v. ) | Violations; Harmless Error |
| THE UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

*Charles W. Gittins*, Law Offices of Charles W. Gittins, P.C., Washington, DC, for the Plaintiff.

*Courtney D. Enlow*, Trial Attorney, Civil Division, United States Department of Justice, Washington, DC, for Defendant. With her on the briefs were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Steven J. Gillingham*, Assistant Director, and *Brian Judge*, Chief, Office of Claims and Litigation, U.S. Coast Guard, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

This case is before the Court on the parties' cross-motions for judgment on the administrative record. Plaintiff, Jeret Rogers, was a member of the Coast Guard before he was discharged from the service on March 1, 2012. He challenges a decision by the Coast Guard's Board for Correction of Military Records ("BCMR" or "the Board") that refused to void the discharge. According to Mr. Rogers, the BCMR's decision was arbitrary, capricious, and contrary to law because it failed to find that the Coast Guard violated its own regulations and committed harmful procedural error in deciding not to retain Mr. Rogers in the service.

For the reasons set forth below, the Court agrees with Mr. Rogers that the Coast Guard violated its procedural regulations when it effected his discharge, that such violations were not harmless error, and that the Board's decision to the contrary was arbitrary, capricious and contrary to law. Accordingly, the government's motion for judgment on the administrative record is **DENIED**, and Plaintiff's cross-motion is **GRANTED**.

## BACKGROUND

### I.      Mr. Rogers's Alcohol Related Incidents

Mr. Rogers enlisted in the United States Coast Guard on February 2, 1998. Admin. Rec. ("AR") at 8. He served in the Coast Guard for over fourteen years. At the time of his separation, Mr. Rogers was working as an Electronics and Information Technology Configuration and Logistics Support Manager with the Coast Guard's Patrol Forces in Southwest Asia ("PATSFORWA"). AR at 9; Compl. ¶ 3, ECF No. 1.

Under the Coast Guard's Personnel Manual, a service member may be discharged for unsuitability for alcohol abuse if he has two or more "alcohol incidents" notated on his military record. U.S. Coast Guard Personnel Manual ("PERSMAN") § 12.B.16.b; Def.'s Mot. for J. on the Admin. R. ("Def.'s Mot.") Regulatory App. ("RA") at 3, ECF No. 8-1. An alcohol incident is defined, in pertinent part, as "[a]ny behavior, in which alcohol is determined . . . to be a significant causative factor, that . . . brings discredit upon the Uniformed Services, or is a violation of the Uniform Code of Military Justice, Federal, State, or local laws." PERSMAN § 20A.2.d; Def.'s Mot. RA at 5. After a service member's first alcohol incident he is referred to counseling and is "advised [that] an additional incident normally will result in discharge." PERSMAN § 20.B.2.g(2); Def.'s Mot. RA at 6. After a second incident, a service member "will normally be processed" for separation. PERSMAN § 20.B.2.h; Def.'s Mot. RA at 6–7. The Commanding Officer ("CO"), however, retains the authority to request the service member's retention. Id.

During his enlistment, Mr. Rogers was involved in two documented "alcohol incidents." Mr. Rogers's first alcohol incident occurred early in his career with the Coast Guard, on October 21, 1998, when he was arrested and charged with driving under the influence in Newport News, Virginia. AR at 8. As a result of this incident, the Coast Guard placed a Performance and Discipline entry in his military record, and referred him for counseling. Id. At that time, the Coast Guard found that Mr. Rogers was neither alcohol abusive nor alcohol dependent and took no additional action. Compl. ¶ 5.

Although his military record includes other disciplinary actions that involved alcohol, Mr. Rogers was not cited for a second alcohol incident until March 25, 2011, while deployed in Bahrain. AR at 9. According to Mr. Rogers, two Coast Guard members observed him having difficulty walking down the street and then urinating in a residential area of Bahrain, close to where he was stationed. Compl. ¶ 6. He admits that although he had just returned to Bahrain from the United States after a forty-one hour trip during which he took a Tylenol PM, he did consume "a small amount of alcohol." Id. ¶¶ 6, 10. According to the Coast Guard's investigation of the incident, Mr. Rogers attended a social gathering with other service members in the evening of March 24, at which he consumed alcohol. AR at 138. That same evening, Mr. Rogers also visited a bar at a local hotel. Id. at 139. It was on his way home at around 6:50 AM that his CO, Captain Bauby, observed him on a public street having difficulty walking and then urinating on the street or in a driveway. Id. Captain Bauby intercepted Mr. Rogers and attempted to escort him back to and into his villa. Id. During this period, Mr. Rogers several times disobeyed Captain Bauby's orders that he sit down in front of the villa while assistance was secured to get him into the villa. Id. at 140.

Coast Guard regulations provide that following an incident that could result in nonjudicial punishment, such as an administrative discharge, the CO should assign a Preliminary Inquiry Officer ("PIO") to investigate the incident. U.S. Coast Guard Commandant Instruction Manuals ("COMDTINST") M5810.1D; AR at 22. Pursuant to those regulations, on April 17, 2011, a PIO was assigned to look into Mr. Rogers's conduct on March 24 and 25. Def.'s Mot. at 8. The PIO conducted an investigation and issued a report that concluded that Mr. Rogers "irresponsibly consumed a large amount of alcohol" which caused him to be publically intoxicated, urinate in a public area, and disobey direct orders from his CO. AR at 144. The PIO recommended that Mr. Rogers be cited for a second alcohol incident and be processed for separation from the Coast Guard. Id. at 145.

## II.    The Separation Proceedings

### A.    <u>Proceedings Before the Administrative Separation Board</u>

On June 7, 2011, Captain Bauby notified Mr. Rogers that he had initiated an action to separate him on the grounds of unsuitability. Id. at 174. He cited the two alcohol incidents as the reason for doing so. Id.

Also on June 7, 2011, Captain Bauby submitted a letter requesting that Mr. Rogers be retained notwithstanding the two alcohol incidents, as permitted by Coast Guard policy. Id. at 12; 166. The Command Request for Retention noted that Mr. Rogers had "diligently served the Coast Guard . . . and performed superbly." Id. at 166. He also cited mitigating factors including the thirteen-year gap between alcohol incidents, Mr. Rogers's long travel preceding the incident, and Mr. Rogers's commitment to abstain from drinking alcohol. Id. at 166–67.

The Coast Guard Personnel Center denied the CO's request on June 10, 2011. Id. at 173. It advised Captain Bauby that Mr. Rogers's discharge would be held in abeyance pending completion of proceedings before an Administrative Separation Board ("ASB"), id., which Mr. Rogers had requested on May 10, 2011, id. at 176.

As described in the Coast Guard's Separation Manual, service members with more than eight years of service are entitled to have their separation reviewed by an ASB. PERSMAN § 12.B.31; AR at 22.[1] The ASB is a "fact-finding body appointed to . . . render findings based on the evidence obtained and make specific recommendations for use by Coast Guard separation authorities." COMDTINST M1910.2 § 1.A.1; AR at 23. The ASB's scope of inquiry includes "all matters relevant to the decisions before the separation authority." COMDTINST M1910.2 § 1.C.2; AR at 23. The ASB is intended to provide the service member "an opportunity to be

---

[1] While the Coast Guard's Personnel Manual refers to these entities as the "Administrative Discharge Board" and the "Discharge Authority," COMDTINST M1000.6A, the Coast Guard's Administrative Separation Board Manual and the BCMR refer to them as the "Administrative Separation Board" and the "Separation Authority." COMDTINST M1910.2 § 1.A.1; AR at 23–25. The ASB Manual clarifies that these names are interchangeable. COMDTINST M1910.2 § 1.A.1.

heard and to present and challenge evidence to be considered by the separation authority." COMDTINST M1910.2 § 1.B.1; AR at 23. The ASB members are "not to review or consider evidence regarding the matters before the Board prior to the hearing" to provide the service member an opportunity to object to or counter evidence. COMDTINST M1910.2 § 4.A; § 1.E. From the evidence considered at the hearing, the ASB develops a factual record, renders findings, and makes "specific recommendations for use by the Coast Guard separation authorities." Id. § 1.A.1. But, notably, "[t]he determinations of an ASB are advisory only, not binding upon the Coast Guard." COMDTINST M1910.2 § 1.A.1; AR at 23.

If a service member elects to have his separation considered by an ASB, his CO typically acts as the Convening Authority ("CA") and will officially convene the ASB. According to the ASB manual, the CA must set forth the reasons justifying the service member's separation and provide the service member notice of "the factual basis for separation processing." COMDITINST M1910.2 § 2.A.3.

Although Mr. Rogers had requested that the ASB be held in Portsmouth, Virginia, the PATSFORWA Deputy Commander sent an email on June 11, 2011 to three members of the unit notifying them that they would be sitting as members of an ASB to be held in Bahrain. Id. at 12, 177. Two days later, on June 13, 2011, Mr. Rogers's CO, Captain Bauby, was replaced by a new CO, Captain Naron. Id. at 12.

Mr. Rogers was transferred to Portsmouth in July 2011. Id. at 14. On July 28, 2011, despite the Deputy Commander's earlier email, Captain Naron formally convened the ASB in Portsmouth as Mr. Rogers had initially requested. Id. He did so in an effort to facilitate the participation of Mr. Rogers's civilian attorney and to ensure that the members of the ASB were not biased. Id. at 14, 189.

On August 12, 2011, the ASB met to hear Mr. Rogers's case. Id. at 14, 65. The ASB reviewed the PIO's investigation of the second alcohol incident, declarations offered by Mr. Rogers in support of his retention, and Mr. Rogers's service record, including his most recent performance appraisals. Id. at 66. It also heard testimony from Captain Bauby, Mr. Rogers, and Mr. Rogers's wife. Id. at 66–67.

In a September 7, 2011 memorandum, the ASB issued its findings of fact, opinions, and recommendations. Id. at 65–69. It found that Mr. Rogers was involved in two separate alcohol incidents, but that he had "accepted responsibility," "completed Level II intensive outpatient treatment," and committed to "abstain from alcohol use for the remainder of his career." Id. at 68. Additionally, the ASB found that Mr. Rogers's "performance since 1998 has been exemplary with only one year of declined performance in 2005" and that he "has a high degree of technical knowledge and competence in the very specialized field of electronics and weapons systems and has sustained superior performance" in his service. Id. at 68–69. From these findings of fact, the ASB concluded that, because Mr. Rogers had "taken responsibility for his actions," has a "high degree of technical training," and is a "highly respected member of the electronics community," Mr. Rogers "has a high degree of potential to continue to contribute to the Coast Guard." Id. at 69. The ASB recommended that Mr. Rogers be retained and that, in the event that he was not, he receive an honorable discharge. Id.

### B. Captain Naron's Command Endorsement

After the ASB convenes and develops its report and recommendations, the Coast Guard's regulations provide for the report to be forwarded to the Convening Authority. COMDTINST M1910.2 § 7.E; AR at 25. The Convening Authority is to confirm that the ASB followed proper procedures and is also to provide a "command endorsement" consisting of "at minimum, a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board." Id. The CA's endorsement and the ASB's full report are then sent to the Separation Authority ("SA"), typically the Coast Guard's Personnel Service Center. Id.

Pursuant to these regulations, Mr. Rogers's ASB forwarded its findings and recommendations to Captain Naron. By memorandum of September 29, 2011, Captain Naron expressed his non-concurrence with the ASB's recommendation that Mr. Rogers be retained in the Coast Guard. AR at 70. He observed that he was "thoroughly convinced that ETC Rogers' overall performance, training, and experience does not warrant retention." Id. Captain Naron cited Mr. Rogers's "poor judgment when he decided to drink excessively with subordinates, violate curfew, publically expose his genitalia, and urinate in front of his Commanding Officer" and concluded that he "had no faith, whatsoever, in ETC Rogers' pledge to voluntarily abstain from consuming alcohol." Id. at 71. Moreover, Captain Naron referenced conversations with unnamed service members whom he alleged had "specifically mentioned their unsatisfactory experiences regarding ETC Rogers' lack of leadership and the poor example he had set as a Chief Petty Officer." Id. at 70. He also claimed that "two individuals within ETC Rogers' division"—again unnamed—"reported they had decided to leave the Coast Guard because of ETC Rogers' poor leadership." Id. Captain Naron concluded that he could not "concur with allowing ETC Rogers' technical training and experience to outweigh his related leadership, judgment, and professional behavior failings." Id. at 71. He then forwarded the ASB's record and its recommendation, along with his command endorsement, to the Separation Authority.

Mr. Rogers, through his attorney, subsequently requested a copy of Captain Naron's endorsement. Id. at 17. The Coast Guard denied the request, noting that the separation regulations do not provide service members the right to view a CA's endorsement. Id. On October 28, 2011, Mr. Rogers submitted a FOIA request seeking copies of the endorsement. Id. The Coast Guard then consulted with Mr. Rogers's attorney and agreed to provide a copy to him. Id.

On November 10, 2011, Mr. Rogers sent the Separation Authority a letter responding to Captain Naron's endorsement. Id. In the letter, Mr. Rogers, among other things, objected to Captain Naron's citation of information not before the ASB, which he characterized as inaccurate. Id. He also complained that he had spent less than 8% of his tour in Bahrain under Captain Naron's command, that Captain Naron had not had a sufficient amount of time to observe his performance and provide an objective opinion, and that many other officers who had served with him for a longer period of time had submitted statements in support of his retention. Id.

### C.  The Separation Authority's Decision

Under the Coast Guard's regulations, the Separation Authority makes the final determination of whether the service member will be retained or discharged. The SA will "review the [ASB's] record and approve or disapprove the [ASB's] findings of fact, opinions, and recommendations in whole or in part." COMDTINST M1000.4 § 1.B.22.d; AR at 25. The SA "may disapprove findings and opinions if they were made based on incomplete evidence, contrary to the evidence the [ASB] considered or to law or regulations . . . or otherwise clearly in error." Id. If the SA disapproves of the ASB's findings of fact or recommendations, the SA may "[a]mend, expand, or modify findings of fact and opinions or take final action other than that recommended," but only "if evidence of record supports that action and the final action states the specific reasons." Id. Pursuant to the regulations, if the SA disagrees with the ASB's recommendation to retain the service member, the SA can take final action to "[d]isapprove the [ASB's] recommendation for retention and direct discharge under honorable conditions with an honorable or general discharge certificate as warranted." COMDTINST M1000.4 § 1.B.22.e; AR at 26.

In this case, the SA issued its "Action of the Final Reviewing Authority" on January 23, 2012. AR at 476. The SA's written notice to Mr. Rogers stated that the SA had "reviewed and . . . approved" the "record, findings of fact, opinions, and recommendations" of the ASB with the exception of its recommendation that Mr. Rogers be retained. The SA did not, however, "state[] the specific reasons" for rejecting the ASB's recommendation to retain, as required by COMDTINST M1000.4 § 1.B.22.d. The SA concluded that "ETC Rogers shall be separated from the Coast Guard . . . for unsuitability due to alcohol abuse." Id.

### D.  Mr. Rogers's Suit in District Court

Upon receiving notice that he would be separated from the Coast Guard, Mr. Rogers filed an emergency action seeking a temporary restraining order and/or a preliminary injunction in the United States District Court for the District of Maryland on February 18, 2012. Id. at 18. He alleged multiple violations of Coast Guard regulations, similar to those alleged in this action, and asked the district court to enjoin the Coast Guard from completing the separation. Id. During a hearing on the motion held the day after it was filed, Judge Ellen Hollander expressed concern about the fairness of the Separation Authority's consideration of charges and information provided in Captain Naron's endorsement, which she understood had not been before the ASB. Id. Nonetheless, she denied Mr. Rogers's request for emergency relief and directed him to exhaust his administrative remedies by appealing the Coast Guard's decision to the BCMR. Id. at 584–85. Accordingly, Mr. Rogers was formally separated from the Coast Guard on March 1, 2012. Id. at 18.

### III.  The BCMR's Decision

On June 7, 2013, Mr. Rogers submitted an application to the Coast Guard's Board for Correction of Military Records in accordance with 33 C.F.R. Part 52, Subpart C. Id. at 3. Among other things, he requested that the Board void his discharge by removing the Form DD-214 that had effected it. Id. at 3–4. He also requested an award of back pay and reinstatement. Id. at 4.

Mr. Rogers made a number of arguments in support of his application, only a few of which he pursues in this action. The Court's opinion, therefore, will describe only those parts of the BCMR's decision that Mr. Rogers challenges in this case, all of which concern the Board's disposition of his allegations of procedural error.

### A. Challenge to Convening Authority's Pre-Hearing Actions

Before the Board, Mr. Rogers alleged that Captain Naron violated the Coast Guard's regulations by improperly communicating with the members of the ASB that considered his separation. Specifically, he claimed that Captain Naron attempted to influence the decision of the ASB by sending the PIO's investigative report to all members of Mr. Rogers's unit, including those members who might have been selected for Mr. Rogers's ASB. Id. at 5, 95. The Separation Manual specifically prohibits ASB members from evaluating evidence until the ASB is formally convened so that the service member has an opportunity to challenge or rebut any evidence that supports separation. COMDTINST M1910.2 § 4.A. Mr. Rogers claimed that Captain Naron's distribution of the PIO report was evidence of "improper command influence," and in violation of Coast Guard regulations. AR at 5.

The Board found that Mr. Rogers failed to show that anything occurred before the ASB convened that prejudiced the proceedings against him or denied him his procedural rights, particularly in light of the fact that the ASB was moved from Bahrain to the United States and that the ASB unanimously recommended his retention. Id. at 28. The Board noted that Mr. Rogers "did not challenge or object to the membership of the ASB" nor did he "challenge the submission of the PIO's report into evidence" once the ASB was convened in the United States. Id. Therefore, the Board concluded that Mr. Rogers's challenge to the Convening Authority's pre-hearing actions was meritless. Id. at 27.

### B. Challenge to Content of Command Endorsement

Mr. Rogers also claimed that Captain Naron violated Coast Guard regulations and his constitutional rights under the Fifth Amendment's Due Process Clause when he included in his command endorsement "unsubstantiated allegations about [Mr. Rogers's] impact on subordinates that were not in the record considered by the ASB and that [he] had had no chance to defend himself against." AR at 6. There were two aspects to this argument. First, Mr. Rogers claimed that consideration of Captain Naron's comments violated his rights under Chapter 1.E.1 of the Separation Manual to be notified of "the factual basis for separation proceedings" because he was advised in the charging document that the proceedings would concern only the two alcohol incidents. Id. at 30. Second, Mr. Rogers claimed that it was legal error for the Separation Authority to consider the derogatory information contained in the command endorsement because Mr. Rogers had not had an opportunity to rebut the information by cross examining either Captain Naron or the unnamed individuals to whom he referred. Id. at 32.

The Board rejected these arguments. It noted that even though the alcohol incidents formed the factual basis for his separation, the ASB's inquiry is "very broad" and includes not only the grounds for discharge, but also a "member's suitability for retention in service." Id. at 31 (citing COMDTINST M1910.2 § 1.A.1). Mr. Rogers and his attorney were aware of the broad scope of the ASB's inquiry, the Board observed, "as they presented a large amount of evidence

about the applicant's skills and performance unrelated to the applicant's alcohol abuse." Id. "In this regard," the Board found, "the Coast Guard did not deviate from its rules and the applicant was not denied due process." Id.

The Board also rejected Mr. Rogers's argument that his constitutional rights under the Due Process Clause and his procedural rights under the regulations were violated when Captain Naron communicated to the Separation Authority derogatory statements concerning his leadership abilities and relationships with subordinates. The BCMR observed that the CA is not a decision maker like a judge who may not base a decision on evidence that is not in the record. Id. at 32. Rather, according to the Board, the CA makes recommendations to the decision maker and "is supposed to express his own views about the applicant's suitability for retention in his endorsement after at least reviewing the ASB's report." Id. It observed that the service member is ordinarily not entitled to respond to the CA's endorsement, "even though the applicant has a right to cross examine witnesses during the ASB." Id. According to the Board, "the [CA's] endorsement is, in essence, a written statement that the rules do not permit a Respondent to contest" and that the regulations "place no limits on the matters the [CA] may address." Id.

The Board further noted that the Separation Authority is expressly authorized to reject an ASB recommendation if it is "based on incomplete evidence." Id. at 32 (citing COMDTINST M1000.4 § 1.B.22.d). The Board reasoned that "[o]bviously, the Separation Authority cannot know whether the ASB's findings and opinions were based on incomplete evidence unless the Separation Authority is made aware of and considers evidence that was not presented to the ASB." Id. at 32. The Board concluded that Captain Naron's endorsement in this case did not violate the rules "because the rules do not limit the matters the [CA] may address and expressly allow the Separation Authority—the final reviewing authority—to consider evidence the applicant has not had an opportunity to rebut or contest." Id.

Similarly, the Board rejected Mr. Rogers's argument that Captain Naron's endorsement violated his right to due process under the Fifth Amendment. Id. It recognized that Mr. Rogers did not have a property interest in continuing his Coast Guard career, but acknowledged that he had a protected liberty interest at stake because the grounds for his discharge were stigmatizing in nature. Id. The BCMR concluded, however, that Mr. Rogers had received all of the process he was due under the Constitution to protect his liberty interest, because he received notice of the grounds for his discharge, as well as multiple opportunities to refute the charges. Id. at 32–33.

### C. Challenge to the Separation Authority's Failure to Specify Reasons for Rejecting ASB Recommendation to Retain

In addition to challenging the content of the command endorsement, Mr. Rogers argued (and the Board agreed) that the Separation Authority committed error when it failed to state the specific reasons (or, in fact, any reason) for its decision to reject the ASB's recommendation to retain him. Id. at 33. Nonetheless, the Board noted, the SA was entitled to reject the ASB's recommendation, so long as the "evidence of record supported that action." Id. And based on its de novo review of the record before it, the Board found "ample evidence" to support the SA's decision. Id. (quoting COMDTINST M1000.4 § 1.B.22.d). The Board found that the procedural error the SA committed by failing to supply reasons for its decision was not prejudicial because it was not "causally connected" to its determination not to retain Mr. Rogers. Id. Rather, the

Board concluded, the failure to provide an explanation constituted mere "harmless error." Id.
(citations omitted).[2]

## IV.     This Action

Mr. Rogers filed a complaint in this Court on April 9, 2015. ECF No. 1. He alleges that
the Board's decision declining to void his discharge based on procedural error was arbitrary,
capricious, and contrary to law.[3] The government filed a motion for judgment on the
administrative record on August 7, 2015. ECF No. 8. Mr. Rogers filed his response and cross-
motion for judgment on the administrative record on September 18, 2015. ECF No. 9. Oral
argument on the cross-motions was held on January 7, 2016.

## DISCUSSION

## I.      Jurisdiction of the Court

The Tucker Act provides the Court of Federal Claims with jurisdiction to hear "any claim
against the United States founded either upon the Constitution, or any Act of Congress or any
regulation of an executive department, or upon any express or implied contract with the United
States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C.
§ 1491(a)(1) (2012). While the Tucker Act waives the sovereign immunity of the United States
to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does
not confer any substantive rights on a plaintiff. United States v. Testan, 424 U.S. 392, 398
(1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify
an independent source of a substantive right to money damages from the United States arising
out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v.
Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

The Military Pay Act, 37 U.S.C. § 204, "confers on an officer the right to the pay of the
rank he was appointed to up until he is properly separated from the service." Holley v. United
States, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (quoting Sanders v. United States, 594 F.2d 804,
810 (Ct. Cl. 1979) (en banc)). Accordingly, the Military Pay Act "provides for suit in [the Court
of Federal Claims] when the military, in violation of the Constitution, a statute, or a regulation,
has denied military pay." Antonellis v. United States, 723 F.3d 1328, 1331 (Fed. Cir. 2013)

---

[2] The Board also addressed Mr. Rogers's allegation that he was wrongfully assigned an RE-4
discharge code on his form DD-14 and that the form inaccurately listed the narrative reason for
his discharge as "alcohol rehabilitation failure." AR 7. The Board agreed with Mr. Rogers that
the narrative reason for his discharge was inaccurate and that his discharge form should state
"miscellaneous/general reasons" instead. The Board also found that an RE-3 discharge code
should be assigned, and directed that he receive half separation pay. Id. 34–35.

[3] Mr. Rogers also alleges in the alternative that—in light of its correction of his discharge form to
reflect a discharge for "miscellaneous/general reasons"—the Board erred by not directing that he
receive full separation pay, rather than half separation pay. In light of its ruling that Mr. Rogers's
discharge was unlawfully effected, the Court does not reach this claim.

(quoting Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)). Therefore, this Court has jurisdiction over Mr. Rogers's claim for back pay under the Military Pay Act.

## II.     Standard of Review of Military Correction Board Decisions

The scope of judicial review of military correction board decisions is a deferential one and is "limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)). In cases involving military personnel decisions, "the military is entitled to substantial deference in the governance of its affairs." Antonellis, 723 F.3d at 1332 (quoting Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993)). The court's evaluation "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." Heisig, 719 F.2d at 1157 (emphasis in original). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). And where "reasonable minds could reach differing conclusions on the same evidence," the court cannot "substitute [its own] judgment for that of [the Board]." Heisig, 719 F.2d at 1156.

However, if the Board "'failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the [Board]' . . . its decision runs afoul of even this lenient standard of review." Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Further, while the court is limited to a review of the record that was before the corrections board, Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006), the Board's decision may be reviewed "for failure to correct plain legal error committed by the military," which includes "the military's 'violation of statute, regulation, or published mandatory procedure, or unauthorized act.'" Dodson, 988 F.2d at 1204 (quoting Skinner v. United States, 594 F.2d 824, 830 (Ct. Cl. 1979)).

## III.    Mr. Rogers's Allegations of Procedural Error

It is well established that the military departments, like other federal agencies, are bound by their own regulations. Wagner v. United States, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (citing Service v. Dulles, 354 U.S. 363, 388 (1957)); Carmichael v. United States, 298 F.3d 1367, 1373–74 (Fed. Cir. 2002); Voge v. United States, 844 F.2d 776, 779 (Fed. Cir. 1988). As the Federal Circuit has observed, "[e]ven though Congress has given the military discretion in conducting its affairs, the military is bound to follow its own procedural regulations should it choose to promulgate them." Fisher v. United States, 402 F.3d 1167, 1177 (Fed. Cir. 2005). And "[a] court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion." Id. (citation omitted); see also Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995) (observing that the Federal Circuit "has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy" (emphasis in original)); Dodson, 988 F.2d at 1204 (observing that, although the Secretary was

not required to promulgate regulations establishing criteria for determining to whom the Army would grant re-enlistment, "having done so he is bound to follow them").

Notwithstanding these principles, the military's failure to comply with its procedures for effecting a discharge does not render the discharge itself unlawful where the procedural error is deemed "harmless" because the regulatory violation did not substantially affect the outcome of the matter. Wagner, 365 F.3d at 1361; see also Christian v. United States, 337 F.3d 1338 (Fed. Cir. 2003). Some procedural errors, however, are not subject to harmless error review because the nature of the error is such that a reviewing body is not able to assess the magnitude of its effect. Wagner, 365 F.3d at 1362 (citing Doyle v. United States, 599 F.2d 984 (Ct. Cl. 1979)).

In this case, Mr. Rogers argues that, contrary to the BCMR's conclusions, the Coast Guard violated a number of its procedural regulations in connection with his separation and its procedural errors were not harmless ones. For the reasons set forth in greater detail below, the Court rejects Mr. Rogers's contention that Captain Naron (serving as the Convening Authority) committed harmful procedural error by providing members of the ASB with copies of the PIO report before the ASB formally convened. It also finds without merit Mr. Rogers's argument that Captain Naron's command endorsement did not satisfy the regulatory requirement that it include "a statement of concurrence with the findings, opinions, and recommendations" of the Board.

On the other hand, the Court finds—contrary to the BCMR's decision—that Mr. Rogers was denied important procedural protections granted him under the Coast Guard's regulations when Captain Naron improperly referred in his command endorsement to derogatory statements about Mr. Rogers's leadership and character that were allegedly made by unnamed third parties and that were never made part of the record before the ASB. Moreover, as the BCMR recognized, the Separation Authority then further violated Coast Guard regulations by failing to provide any explanation for its decision to reject the ASB's recommendation that Mr. Rogers be retained.

The Court further concludes that given that the Separation Authority enjoyed broad and essentially unreviewable discretion to decide whether or not to retain Mr. Rogers, it is not possible to assess the magnitude of the effect of the improper evidence in the command endorsement on the ultimate decision to separate Mr. Rogers. Therefore, the harmless error rule is not applicable and Mr. Rogers's separation was unlawful. Moreover, even if harmless error analysis applied, the government cannot show that there was no substantial nexus or connection between the procedural error and Mr. Rogers's separation because the Separation Authority failed to provide an explanation for his decision to reject the ASB's recommendation to retain Mr. Rogers.

## A. Alleged Pre-Hearing Violations of Regulations

Mr. Rogers first alleges that copies of the PIO's investigative report about the March 25 incident were improperly provided to every member of the command in Bahrain. Pl.'s Opp. to Def.'s Mot for J. on the Admin. Rec. and Pl.'s Cross-Mot. for J. on the Admin. Rec. (Pl.'s Cross-Mot.) at 18, ECF No. 11. As a result, Mr. Rogers claims, potential ASB members and witnesses were exposed to the incident report before the ASB formally convened and before Mr. Rogers had the opportunity to present mitigating evidence. Id. Mr. Rogers further alleges that, once the

ASB was moved to the United States, Captain Naron again sent the PIO report directly to the appointed ASB members. Id. at 18–19. He claims that these actions violated the Coast Guard's regulation that instructs ASB members not to consider evidence before the hearing, COMDTINST M1910.2 § 4.A, and the regulations that require that the Convening Authority provide copies of his communications with ASB members to the member facing discharge, COMDTINST M1910.2 § 3.d.1. Id. at 19.

Even assuming that these actions violated Coast Guard regulations, in order to prevail by demonstrating a procedural error in a military discharge case, Mr. Rogers must show that "the defect substantially affected the decision to separate him," or must at least "set forth enough material to impel the court to direct a further inquiry into the nexus between the error or injustice and the adverse action." Christian, 337 F.3d at 1343 (quoting Hary v. United States, 618 F.2d 704, 707 (Ct. Cl. 1980)).

In this instance, any pre-hearing disclosure of the PIO report to the command in Bahrain plainly did not substantially affect the ultimate decision to separate Mr. Rogers because the ASB was convened in the United States, as he requested. Compl. ¶ 50. Further, even assuming that members of the ASB in the United States also received advanced copies of the PIO (an allegation that the government points out is not supported by the record), Mr. Rogers posed no objection to the composition of the ASB on that basis and did not object to the introduction of portions of the PIO's report at the hearing. AR at 28. And any error committed with respect to this matter would be harmless because, in the end, the ASB unanimously recommended that Mr. Rogers be retained with the Coast Guard. Therefore, the Court concludes that the Board was correct when it found that Mr. Rogers had failed to demonstrate prejudicial procedural error with respect to these matters.

**B.  Alleged Failure to Comply with COMDINST M1910.2 § 7.E.3 Requiring that the Command Endorsement Include a Statement of Concurrence or Disagreement with ASB Findings, Opinions, and Recommendations**

Mr. Rogers next alleges that the command endorsement that Captain Naron prepared and transmitted to the Separation Authority in his role as Convening Authority did not comply with COMDINST M1910.2 § 7.E.3, which requires that the endorsement include, "[at] a minimum, a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board." Pl.'s Cross-Mot. at 19–20. He argues that this regulation requires that the Convening Authority separately state his concurrence or disagreement with each of the ASB's factual findings, with each of the ASB's opinions, and with each of the ASB's recommendations. According to Mr. Rogers, Captain Naron, contrary to this requirement, "failed to address the Findings of Fact or the Opinions in any way." Id. at 21.

The Court disagrees with Mr. Rogers's argument that COMDINST M1910.2 § 7.E.3 required Captain Naron to expressly address each factual finding, opinion, and recommendation of the Board in his endorsement. The language of the regulation does not support this position. It merely requires "a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board." It does not indicate that a statement of concurrence or disagreement is required for each finding, opinion, and/or recommendation contained in the ASB's memorandum.

Captain Naron's endorsement was in compliance with the regulatory requirement as properly construed because it clearly expressed his concurrence or disagreement with the ASB's findings, opinions, and recommendations as a whole. In his September 29, 2011 memorandum, Captain Naron wrote that, "in accordance with [COMDINST M1910.2] this endorsement serves as my non-concurrence" with the ASB memorandum "recommending retention of ETC Rogers." AR at 70. He explained that "[a]fter again reviewing ETC Rogers' personnel record, and carefully considering the findings and opinions of the Administration Separation Board, I am thoroughly convinced that ETC Rogers' overall performance, training, and experience does not warrant retention." Id. He went on to supply his reasons for disagreeing with the ASB's opinion that Mr. Rogers had taken responsibility for his actions and was committed to sobriety. Captain Naron then explained that because of this difference in opinion (among other reasons, discussed below), he disagreed with the ASB's recommendation that Mr. Rogers be retained. Id. The Court concludes that this written statement is sufficient to satisfy the regulation's requirement that the endorsement include "a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board."

## C. Alleged Violations Based on the Command Endorsement's Discussion of Evidence Not Before the ASB

Mr. Rogers's third claim is that Captain Naron violated the regulations when he made "new allegations" in his command endorsement that concerned Mr. Rogers's capacity for leadership. According to Mr. Rogers, by doing so he interjected an issue for the Separation Authority's consideration that was outside the stated grounds for discharge provided to him at the outset of the process. Pl.'s Cross-Mot. at 22. He further objects to Captain Naron's reference in the command endorsement to derogatory information about Mr. Rogers that was not part of his military record or the record developed before the ASB. Id.

The Court finds no merit to Mr. Rogers's claim that his character and performance, including his leadership skills, were outside the scope of the matters properly before the ASB. According to the ASB manual, in addition to making findings related to the "extent to which the evidence supports separation" the ASB also "documents facts relating to the Respondent's conduct, competency, background, character and attitudes." COMDTINST M1910.2 § 1.C.1. In fact, as the Board observed, Mr. Rogers himself introduced several statements addressing his character, including a letter from his former CO, Captain Bauby, who specifically mentioned Mr. Rogers's leadership skills. AR at 440, 445. Therefore, Mr. Rogers's character and leadership skills were properly before the ASB, and the CA had a right to state his disagreement with the ASB's findings and opinions on those matters, at least to the extent that he based his disagreement on information that was contained in Mr. Rogers's military record or the rest of the record before the ASB.

Captain Naron, however, did not base his disagreement with the ASB's recommendation solely on information that was in Mr. Rogers's military record or the record developed in front of the ASB. Thus, in his endorsement he cited what he characterized as "numerous outbriefs that departing members had with the PATFORSWA Command Master Chief and Deputy Commander" in which "PATFORSWA personnel repeatedly and specifically mentioned their unsatisfactory experiences regarding ETC Rogers' lack of leadership and the poor example he had set as a Chief Petty Officer." Id. at 70. Captain Naron further stated that "two individuals

within ETC Rogers' division reported they had decided to leave the Coast Guard because of ETC Rogers' poor leadership." Id. Moreover, Captain Naron alleged, "several other enlisted members within ETC Rogers' department reported a disappointing lack of professional development opportunities and not fully enjoying their PATFORSWA tour because of ETC Rogers' lack of leadership, professionalism, and proper behavior." Id.

The Court agrees with Mr. Rogers that Captain Naron exceeded the scope of his authority as Convening Authority and violated Mr. Rogers's rights under the regulations by supplying this extremely damaging non-record evidence for the Separation Authority's consideration, without ever making it available to the ASB. By doing so, he frustrated the core purpose of the ASB process—to protect the significant interests that members with at least eight years of service possess when they face an involuntary discharge, potentially with an other than honorable characterization—by affording them rights to fully participate in the development of the factual record that will be considered by the final decision maker (the Separation Authority).

Thus, the section of the Manual entitled "Reasons for Administrative Separation Boards" states as follows:

> Coast Guard discharge and retention decisions are driven by the needs of the Coast Guard overall, not by the needs of individual members or individual commands. Members do not have a right to remain on active duty in the Coast Guard, regardless of the length of their service or the hardship their separation might cause. Nevertheless, a member's military career often represents a considerable investment, both by the member and by the service. In addition, when a member is discharged, the Coast Guard's characterization of that service – as honorable, general under honorable conditions, or other than honorable – and occasionally other determinations surrounding that decision, can have a profound impact on the member's future. Sound personnel management, as well as fairness, dictate that the decision to separate such a member be carefully considered, and that the member be provided an opportunity to be heard and to present and challenge evidence to be considered by the separation authority.

COMDTINST M1910.2 § 1.B.1 (emphasis supplied); see also id. § 1.A.1 (describing the ASB as a "fact-finding body appointed to investigate a member's suitability for retention in the service, render findings based on the evidence obtained, and make specific recommendations for use by the Coast Guard separation authorities"); id. § 1.E.1 (stating that the "principal purpose of ASBs is to accord the [service member] an opportunity to be heard and to present evidence regarding the matters upon which an adverse separation decision may be made"); id. Encl. 5 ("Sample Letter to Respondent from Senior Member [of ASB]" advising the service member that "[t]he Board's purpose is to gather evidence, both in your favor and adverse to you, as necessary for the separation authority to make sound decisions regarding whether to separate you from the Coast Guard").

To these ends, a section of the Manual entitled "Rights of Coast Guard Members before Administrative Separation Boards," guarantees members with at least eight years of service a number of critical rights in the ASB process. These include, among others: 1) the right to be represented by counsel; 2) the right to be present during the proceedings; 3) the right to examine

and object to the consideration of physical and documentary evidence; 4) the right to object to the testimony of witnesses and cross examine witnesses; 5) the right to introduce evidence, including witnesses; and 6) the right to testify as a witness. Id. §§ 1.E; 6.A.4.

By contrast, the Convening Authority generally plays no role in the development of the record once the ASB proceedings begin. Thus, under the regulations, the CO is initially responsible for "gather[ing] all available information that provides support for all the applicable bases for the proposed recommendation for discharge." Id. § 2.A.3. After the member receives "official notification of the recommendation for a discharge in accordance with the Personnel Manual" he may request an ASB. If he does so, the CO acts as the "Convening Authority." Id. § 1.A.2. He prepares a "convening order" which designates members of the ASB, explains its role, and sets forth a date and place for the ASB to convene. Id. §§ 2.A.3; 3.A; see also id. Encl. 3 ("Sample Convening Order"). The convening order also designates a "Recorder," a non-voting member whose function is to "assemble and present relevant evidence to the Board regarding the issues before it." Id. § 3.C.4.

After the ASB has been selected, the Convening Authority's role ends until he receives the final report from the ASB, as described below. In fact, the CA is only permitted to communicate with ASB members in writing and must provide a copy of any communication to the service member. Id. § 3.D.1. The regulations provide that "[t]he Convening Authority may request specific issues to be determined by the Board, including whether the member should be discharged with an 'other than honorable' discharge, but should express no opinions or recommendations regarding the issues before the Board." Id. They further discourage the participation of the Convening Authority as a witness, while noting that he nonetheless "may be called when circumstances make such testimony relevant to matters before the Board." Id.

The Recorder is responsible for placing evidence into the record before the ASB and acts in essence as a prosecutor. Id. Encl. 7 ("Advice to Recorders Before Administrative Separation Boards"). Before the ASB convenes, "the Recorder conducts an initial investigation to assemble evidence for presentation to the Board," a task which includes, among other things, obtaining "[r]elevant documents and other information" from the member's command. Id. § 4.B.1. "The Recorder must investigate all sources of information and present evidence to bring out the facts in an impartial manner, with due regard for the opportunity for Respondent to present evidence and argument on his or her own behalf." Id. § 3.C.4; see also id. Encl. 7 (advising a Recorder to "[i]nterview Respondent's chain of supervisors, peers, and any witnesses on the merits of the case"). Both the Recorder and the member are to be afforded "reasonable opportunities to interview witnesses and obtain relevant evidence prior to and throughout the hearing process." Id. § 4.B.2. Any evidence presented to the ASB by the Recorder must also be made available to the service member. Id. § 3.D.2.

The ASB Manual provides that a member is entitled to present witnesses at his own cost and may also request that the Coast Guard pay for the travel and production of witnesses where, among other things, "the testimony of the requested witness is material and necessary (i.e., not unnecessarily cumulative) for a fair determination of the case." Id. § 4.C.4(a). It further states that "[a]lthough testimony given under oath and subject to cross-examination is often more persuasive than a written statement," the introduction of such statements into the record may be appropriate where "a relevant matter is not in dispute;" where "the testimony is not readily

obtainable;" "[w]hen the person who made the statement testifies at the hearing or is available to testify on cross-examination;" "[w]hen the Respondent offers the statement (e.g. character statements);" and "[w]hen the Respondent does not object." Id. § 6.D.1.

After hearing the evidence presented by both the Recorder and the service member, the ASB is instructed to develop a report with its findings of fact, opinions, and recommendations. The manual explicitly states that the "facts" developed by the ASB "shall include only those facts the evidence establishes, and nothing further." Id. § 7.B.2(a). The Recorder prepares the "Record of the Proceeding," which includes the ASB's report, a verbatim transcript (if any), all exhibits, an audio recording of the proceeding (if any), and "[a]ny additional documents necessary to provide an accurate summary of the findings or proceedings," which "should be discussed as necessary, in the preliminary statement of the report of the Board." Id. § 7.C. The ASB's Senior Member then forwards the record of proceedings to the Convening Authority for its consideration. Id. § 7.E.

Upon receiving the record of proceedings, the Convening Authority is empowered to "return the investigation to the Board for correction or further proceedings if it does not comply with the requirements of [the] Manual." Id. § 7.E.2. Otherwise, the Convening Authority's function is to "review the report and provide a command endorsement," id. § 7.E.3, and then forward the ASB report and his endorsement to the Separation Authority, id. § 7.E.4.

As described above, the ASB Manual states that "the command endorsement shall include, at a minimum, a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board." Id. § 7.E.3. In this case, as noted, Captain Naron's endorsement included not only a statement of his views concerning whether the ASB's findings and recommendations were supported by the record before it, but also references to derogatory statements about Mr. Rogers's character and leadership allegedly made by unnamed peers and/or subordinates, but never made part of the record before the ASB.

According to the BCMR and the government, Captain Naron acted within his authority in supplying this extra-record and damaging information as part of his endorsement because the regulations only set a floor on what a command endorsement must contain (i.e., "a statement of concurrence or disagreement with the findings, opinions, and recommendations of the Board"); they do not, according to the government, prescribe any limitations on the information that the convening authority may include in his endorsement. AR at 32; Def.'s Mot. at 22. But this reading of the regulations would permit the Convening Authority to assemble and present an entirely new and secret record to place before the Separation Authority. Indeed, at the oral argument on the cross-motions for judgment on the administrative record, counsel for the government stated, in essence, that it would be permissible under the regulations for Captain Naron to have included as part of the endorsement he sent to the Separation Authority an unlimited number of sworn witness declarations purporting to attest to Mr. Rogers's unsuitability for retention. Oral Arg. at 30:00.

The Court rejects the government's interpretation of the regulatory provision referencing the content of the command endorsement because it is patently inconsistent with the broader regulatory framework in which the regulation appears and would undermine its purposes. See Lengerich v. Department of Interior, 454 F.3d 1367, 1370 (Fed. Cir. 2013) ("We construe a regulation in the same manner as we construe a statute . . . . . we examine the text of the

regulation as a whole, reconciling the section in question with the sections related to it."). As the foregoing description of the ASB process makes clear, it is the ASB, not the Convening Authority, which is charged with developing the evidence and assembling the record that the SA will use to make the separation decision. It is the Recorder who is to interview the member's supervisors, peers and other individuals with relevant information, and decide which of them to call as witnesses. To the extent, therefore, that Captain Naron wished for the Separation Authority to consider the assertions of the unnamed accusers, such information should have been made available to the Recorder at the outset of the process or at least communicated to the ASB before the process ended, with copies of any communications provided to Mr. Rogers, as the regulations require.

Moreover, as described above, the regulations include numerous safeguards to ensure that the member facing separation (and a potentially other than honorable discharge) is given an opportunity to rebut any adverse information contained in the record that will be placed before the Separation Authority. Thus, the member is entitled to present his own witnesses and documentary evidence and to cross-examine adverse witnesses. Further, the member may also object to the presentation of written statements into the record and demand that the individuals making the statements be called as witnesses. These rights would be hollow ones indeed if, as the government contends, the Convening Authority may include in his endorsement information that the member never had the opportunity to review and respond to, including statements attributed to unnamed individuals never called as witnesses in the ASB proceedings.

In short, in the Court's view, when the entire regulatory scheme is considered, it is clear that the command endorsement was intended to serve as the CA's opportunity to present his views on whether the findings, opinions, and recommendations of the ASB were or were not supported by the record that the ASB assembled in accordance with the detailed requirements of the Manual. It could not have been conceived as an opportunity for the CA to introduce a round of new evidence to rebut the ASB's findings, conclusions, and/or recommendations because affording the CA such an opportunity would gut the other protections afforded to members facing separation.

In that regard, the Court finds unpersuasive the BCMR's reliance upon the Separation Authority's regulatory authority to reject an ASB recommendation if it was "based on incomplete evidence." AR at 25 (citing COMDTINST M1000.4 § 1.B.22.d). According to the Board it is "[o]bviou[s]" that "the Separation Authority cannot know whether the ASB's findings and opinions were based on incomplete evidence unless the Separation Authority is made aware of and considers evidence that was not presented to the ASB." Id. at 32. Therefore, the Board reasons, the regulations necessarily contemplate that the CA will make the Separation Authority aware of such extra-record evidence by providing it to the Separation Authority as part of his endorsement. Id.

Contrary to the Board's views, it is not necessary for the Separation Authority to have conflicting evidence placed before it in order to determine that the evidence before the ASB was "incomplete." Even without access to additional conflicting evidence, the Separation Authority might reasonably find that the evidence before the ASB was "incomplete" in the sense that the documents in the record or the witnesses who testified did not supply credible, sufficient, or otherwise adequate evidence to support the ASB's findings, opinions, and/or recommendations. In that circumstance, the Separation Authority might either reject the ASB's findings, opinions,

or recommendations or instead might remand the matter back to the ASB for it to further develop the record, presumably with the participation of the service member as provided in the regulations. COMDTINST M1000.4 § 1.B.22.d; AR at 25–26 (authorizing the Separation Authority to take final action other than recommended "if evidence of record supports that action" or to "[r]eturn the record to the [ASB] for further consideration").

The BCMR also stated that the Coast Guard's regulations "expressly allow the Separation Authority—the final reviewing authority—to consider evidence the applicant has not had the opportunity to rebut or contest." AR 32. This statement was made with no supporting citation and finds no support in the applicable regulations describing the Separation Authority's functions or options found at COMDTINST M1000.4 §§ 1.B.22.d–1.B.22.e; RA 1–2. There is no mention in the instructions applicable to the Separation Authority that he or she may consider evidence that was not placed before the ASB. To the contrary, the Separation Authority is instructed that when he "receives the record of the administrative discharge proceedings, he or she will review the board record and approve or disapprove the board's findings of fact, opinions, and recommendations in whole or in part." COMDTINST M1000.4 § 1.B.22.d (emphasis supplied); RA 1.

Further, the Court finds it telling that under a regulatory scheme that is expressly designed to provide members with at least eight years of service the protections of an evidentiary hearing before discharge, such members are not afforded the right to even review the command endorsement before it is forwarded to the Separation Authority, much less respond to it. This suggests to the Court that the endorsement itself serves a more limited purpose than the one the government proposes. For if there is no limit to what the endorsement may contain, and no right on the part of the member to review or respond to the content of the endorsement, then the ASB's purpose of providing members with "the opportunity to be heard and to present and challenge evidence to be considered by the separation authority" would be completely frustrated.

To be sure, in this case, Mr. Rogers secured a copy of the endorsement after making a FOIA request, and was able to respond in writing to the endorsement. But that happenstance does not change the fact that there is no right under the regulations to review the endorsement or to respond to it, which suggests to the Court that the endorsement was not intended to serve as an opportunity for the CA to inject additional evidentiary material into the process. Moreover, the fact that Mr. Rogers was able to submit a written response to the endorsement is not a substitute for the rights he would have enjoyed had Captain Naron, or anyone else in Mr. Rogers's chain of command, placed the derogatory information before the ASB as they could have done by supplying it to the Recorder. In that circumstance, Mr. Rogers would have had the right to marshal evidence in opposition to the accusations and to directly confront his accusers and cross-examine them. At the very least, one assumes that he would have known the identity of the accusers. Because the accusations instead came in the form of Captain Naron's repetition of negative information from anonymous accusers in a statement provided after the ASB process was over, Mr. Rogers's procedural rights were violated and his ability to make his case significantly disadvantaged.

### D.  Harmless Error

For the reasons set forth above, the Court rejects the Board's conclusion that the inclusion of derogatory third-party reports about Mr. Rogers's character and performance in the

command endorsement did not violate the Coast Guard's regulations. As set forth in greater detail below, the Court further concludes that the procedural violation is not subject to harmless error review and that, even if such review were appropriate, the error in this case was not a harmless one.

As noted above, a procedural violation is not subject to harmless error review where "the magnitude of the effect of the error on the proceeding defies assessment by a reviewing body." Wagner, 365 F.3d at 1364; see also Doyle, 599 F.2d at 996 (harmless error review is not appropriate where "it is not possible for a reviewing body to determine what effect the error had on the judgment of the original proceeding"). That circumstance is presented in this case. Thus, it is undisputed that—especially in light of the two alcohol incidents in which Mr. Rogers was involved and which the ASB concluded had been proven—the Separation Authority had virtually unlimited discretion to decide whether or not to accept the ASB's recommendation that Mr. Rogers be retained. The decision whether to accept the recommendation was ultimately dependent upon the Separation Authority's subjective judgment as to which option—retention or discharge—was in the Coast Guard's best interests.

The fact that there are no objective standards that would govern the Separation Authority's discharge decision is significant.[4] Thus, here, as in Wagner, "had the [Coast Guard] complied with its regulation . . . the [Separation Authority's] decision would not have been reviewable by any court." 365 F.3d at 1364; see also Godwin v. United States, 338 F.3d 1374, 1377 (Fed. Cir. 2003) (finding that the "substance of decisions as to the composition, training, equipping, and control of a military force is frequently beyond the institutional competence of courts to review" (quoting Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002))); Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he merits of the Air Force's decision to release [an officer] from active duty are beyond judicial reach."); Sargisson v. United States, 913 F.2d 918, 921–22 (Fed. Cir. 1990) (absent procedural error, the decision to release surplus officers and who should be released was a decision for the military to make). Given the Separation Authority's broad discretion to determine whether Mr. Rogers should be retained, and the lack of objective standards governing its exercise, it is not possible for the Court to assess what effect, if any, consideration of the extra-record derogatory information in the endorsement had on the Separation Authority's ultimate decision. See Wagner, 365 F.3d at 1365 (finding that the harmless error analysis is appropriate only "[w]here reviewable standards or factors constrain the exercise of discretion," and that it does not apply to "standardless discretionary decisions" (citing Carmichael, 298 F.3d at 1375–76, and Sargisson, 913 F.2d at 922–23)).

In any event, even if this were a case in which harmless error review was otherwise appropriate, determining the effect of the procedural error on Mr. Rogers's separation would

---

[4] The Coast Guard's regulations do provide some standards within which the Separation Authority may exercise its discretion to disapprove the ASB's findings of fact and opinions— i.e., it may disapprove those finding and opinions if it determines they were: 1) based on incomplete evidence; 2) contrary to the evidence the ASB considered; 3) contrary to law or regulation; 4) based on a misunderstanding of written policy; or 5) otherwise clearly in error. COMDINST M1000.4 § 1.B.22.d. But there are no substantive constraints at all on the Separation Authority's decision to reject the ASB's recommendation to retain a member other than a requirement that the "evidence of record suppor[t] that action." Id. § 1.B.22.d(1).

present an insurmountable challenge because the Separation Authority—in admitted violation of Coast Guard regulations—failed to provide any explanation for its decision to reject the ASB's retention recommendation (while accepting the ASB's findings of fact and opinions). It is conceivable that had the Separation Authority explained its a rationale for rejecting the ASB's recommendation, the Court might have been able to assess whether the information in Captain Naron's endorsement substantially affected its decision-making. But because the Separation Authority did not comply with Coast Guard regulations in that respect, the Court can, at best, only speculate about what the Separation Authority would have decided to do had Captain Naron not improperly included the derogatory information in his command endorsement.[5]

For that reason, even assuming harmless error review were appropriate in this case, the Court concludes that the government has failed to meet its burden of showing that the error at issue was, in fact, a harmless one. In the Court's view, Mr. Rogers has "set forth enough material to impel the court to direct further inquiry into the nexus between the error or injustice and the adverse action" so that the burden has shifted to the government to show that "there was no substantial nexus or connection" between the violation of the Coast Guard regulation and Mr. Rogers's discharge. Christian, 337 F.3d at 1343 (quoting Engels, 678 F.2d at 175). Specifically, as noted, the Separation Authority purported to concur with each of the ASB's factual findings and opinions—and yet decided to reject the ASB's recommendation to retain. Under these circumstances (and again without the benefit of any explanation from the Separation Authority), it seems eminently plausible to the Court that the Separation Authority's decision to separate Mr. Rogers was substantially affected by the extra-record derogatory information contained in the command endorsement. Thus, at the very least, Mr. Rogers has met his burden of producing enough evidence to direct further inquiry, and it falls to the government to show that there is no substantial nexus or connection between the regulatory violation and the final decision.

The government has not met this burden. It does not point to anything in the record that shows that the Separation Authority would have taken the same action even if the improper information was not before it. Rather, the government argues that the error should be ruled harmless because there was "ample evidence" in the record before the BCMR to support the Separation Authority's decision. Def.'s Resp. to Pl.'s Cross-Mot. for J. on the Admin. R. at 6, ECF No. 12. But the relevant question for purposes of harmful error review is not whether the outcome that was reached is theoretically defensible; it is whether the outcome would have been different if the Coast Guard had complied with its regulations. Thus, even assuming the applicability of the harmless error rule in this case, the government has failed to show that the error was a harmless one because the record is insufficient to show that the Separation Authority would have reached the same outcome even if the procedural violation had not occurred.[6]

---

[5] The Court, like the BCMR, gives no weight to the Separation Authority's post-hoc explanation of its decision to reject the ASB's recommendation, which it submitted almost two years after its decision to separate Mr. Rogers and only for the purposes of litigation. AR 33–34.

[6] Because the Court has concluded that the Coast Guard's violated its own regulations, and that such violations may not be deemed harmless, it does not address Mr. Rogers's further claim that the Coast Guard also violated the Fifth Amendment's due process clause in effecting his discharge. See Hagans v. Lavine, 415 U.S. 528, 547 (1974) (observing that "a federal court

### IV.    Remedy

The Military Pay Act "confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service." Smith v. Sec'y of Army, 384 F.3d 1288, 1295 (Fed. Cir. 2004) (quoting Sanders, 594 F.2d at 810). For the reasons set forth above, the BCMR's decision finding that the Coast Guard committed no harmful procedural error in effecting Mr. Rogers's discharge is contrary to law. Because Mr. Rogers was not properly separated from the Coast Guard, he is entitled to an award of back pay and allowances back to the date of his wrongful discharge. Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (noting that the Military Pay Act entitles plaintiff to "money in the form of the pay that the plaintiff would have received but for the unlawful discharge").

Further, under the Tucker Act, in actions for monetary relief, "[t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records . . . ." 28 U.S.C. § 1491(a)(2). In light of the Court's ruling that Mr. Rogers was unlawfully discharged, he is entitled to correction of his records and reinstatement as an incident to the award of monetary relief.

### CONCLUSION

For the reasons stated above, the government's motion for judgment on the administrative record is **DENIED**. Plaintiff's cross-motion for judgment on the administrative record is **GRANTED**.

The matter is **REMANDED** to the BCMR for the correction of Plaintiff's military record to reflect his retroactive reinstatement to active duty in the United States Coast Guard. In addition, the BCMR shall issue any orders necessary to ensure that Plaintiff receives back pay and other benefits or allowances to which he is entitled. Finally, the BCMR shall make any other corrections and take any other actions that are required to carry out the Court's instructions.

The remand proceedings shall be completed within 60 days of the date of this Order. The Court **STAYS** proceedings in the instant case during that time. If the BCMR has not corrected Plaintiff's records and provided the relief to which Plaintiff is entitled within 60 days of the date of this Order, the parties shall follow the procedures set forth in the Rules of the Court of Federal Claims ("RCFC") 52.2(d).

In accordance with RCFC 52.2(b)(1)(D), within 45 days of the date of this Order, the government shall file a status report indicating the status of the proceedings before the BCMR.

When the BCMR has corrected Plaintiff's military records, reinstated Plaintiff to active duty with the Coast Guard, and awarded Plaintiff the back pay and other benefits to which he is entitled due to those corrections, it shall forward four copies of its documentation that those tasks

---

should not decide federal constitutional questions where a dispositive nonconstitutional ground is available").

have been completed to the Clerk of the Court of Federal Claims pursuant to RCFC 52.2(e). The parties shall then file, within thirty days of the filing of the BCMR's documentation, the notices required by RCFC 52.2(f)(1).


**IT IS SO ORDERED.**


s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge